The next case is Keil v. City of New York. We're ready to proceed. Mr. Black, can you hear me? I can, Your Honor. Good morning. And Ms. Gibson? I can, Your Honor. Good morning. Good morning. Thank you, Mr. Black. Mr. Black. Thank you, Your Honor. Preliminarily, I wish to thank the Court for allowing Professor Gibson and me to argue remotely and we respectfully reserve two minutes each for rebuttal. May it please the Court. The First Amendment reads, Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. Comforted by this Court's November 28th decision and order, New York City's version of the First Amendment appears to read something like this, Congress shall freely make dozens of laws that prohibit the free exercise of religion so long as reasonable accommodations are considered at the sole discretion of a stealthy tribunal acting in the shadows which shall from time to time grant a request or two, denying the rest with no explanation. In November, the City crafted and this Court adopted against our repeated objections a process for considering religious objections that by virtue of its discretionary nature compels strict scrutiny. And we are not alone in making this argument. The United States District Court for the Northern District of Texas recently held that the United States Navy's vaccine mandate is not true, neutral or generally applicable because, and I quote, the arbitrators do not have individual applications or exemptions. The law invites an individualized assessment of the reasons why a service member is not vaccinated. Consequently, favoritism is built into the mandate, end quote. In its November 28th decision and order, this Court held that the arbitration award's accommodation standards were neither neutral nor generally applicable because, and I quote, the arbitrators reviewing their requests for religious accommodations had substantial discretion over whether to grant those requests. But then the Court went on to order a fresh consideration process which is constitutionally painted by the very same individualized exemptions, which likewise subjected- Wouldn't your argument suggest that Title VII then is unconstitutional? Is that your argument? Not at all, Your Honor. It's just Title VII was designed, was legislated for largely to expand, to broaden anti-discrimination and bring it into the private sector. But Title VII cannot lower the standard of review for discrimination within the government, within a state actor's purview. It cannot. So to the extent that Title VII is applicable to the actions of the citywide panel, well, sure, they can, they must consider, they may consider under Title VII whether the conduct is, whether the position asserted is religious, whether it's sincerely held, but what they cannot do, Judge Livingston, is they cannot lower the level of, from the strict scrutiny level of the First Amendment to the de minimis impact burden that's applicable to a private actor. Mr. Black, isn't the other side arguing, in effect, that this is not subject to strict scrutiny? It's rational basis, notwithstanding the fact that you have this citywide appeals panel, that it's all, it's all rational basis. And of course, the, I think the original panel, the first, the first time around, found that the mandate itself was not facially unconstitutional. You're arguing, I think, that the process, accommodations process, is unconstitutional. Am I correct in that score? That's correct, although we... Then the question is, it seems to me the next question is, are we under rational basis still, or are we under strict scrutiny? And if we're under strict scrutiny, why is that the case? Okay. We have argued before, and we continue to argue, that the mandate itself is subject to strict scrutiny. We recognize and accept that this court has held previously. That's been decided, but the process is clearly subject to strict scrutiny for the following reasons. First, it's over-inclusive and under-inclusive. It is, has a history of religious animus in its application. It involves hybrid rights. We've cited that in our brief. And most importantly, it is replete with boundless discretion. We don't know who these people are who are making these decisions. They do it behind closed doors. They provide summary denials without any explanation. And then, when we go in... There was an explanation given after, you know, I think they did the interviews for a couple of days, and then there was a weekend, and then they came out with their decisions after that. Your Honor, I respectfully disagree with that factual recitation, because what really happened is at almost 5 p.m. on Friday, within one hour of each other, every single appellant received a denial, to my understanding, of the original appellants before the complaint was amended. And there were no reasons given, and on its face, on its face, it said, final decision. This is the final decision. It did not say anything else was going to be forthcoming. There was no indication to counsel that anything else was going to be forthcoming. But something was... And it... But something did. But in fact, there was additional explanation that eventually you were provided, right? Yes, well after we had argued our motion, five days later... I'm just trying to get the time, make sure that I understand the timeline. Do you receive the summaries before or after the district court's decision? My understanding is it was after the district court's decision. And in fact, it's important to note, Judge Livingston, that that day, the city sent, I believe it was via a letter to the court, there was a writing by the city which indicated that only that morning, they had been advised that there were reasons that had been provided. This was apparently as much a surprise to them, and we're not going to in any way suggest that this was concocted later with less than appropriate motives. So it was perhaps a surprise to them, but it was certainly a surprise to us. But most important, it's important for this panel to understand the position that we, as advocates, advising our clients under the rules of ethics, having to zealously advocate our clients' interests within the bounds of the law. We received a notice at 5 p.m. on Friday that said you have three days. And it was a confusing notice because they were already technically on leave without pay, but it said you'll be put on leave without pay. There was clearly some error. Does that mean they're going to be fired? Does it mean they're not going to be fired? What does that mean? In any event, it requires some choice and some coercion into potentially violating their religious convictions. So with three days left to make some decision for we don't know what's going to happen, possibly including termination, we certainly can't engage in any discovery. We can't run back to this panel that we don't even know of. When did you learn that the three days would not apply to your clients? We never learned of that at all. The three days was the three days. There was nothing that we're aware of that suggests that those three days did not apply. We had three days. And so in that three day process, we had to rush. We worked through the weekend and I believe it was Saturday evening. Was it three days or was it three business days? It was three business days, Judge Pierce. But I believe that the calculation was that the very first business day on which it could be enforced against anyone was going to be Tuesday morning, if I recall. And so we rushed and placed it before or might have been Wednesday morning. And so we rushed to get it before Judge Caproni that weekend. And we requested a Monday morning, 10 a.m. ruling by the court so that we had some time and some flexibility to scramble and possibly come up to this court should it be denied over there. We could just sit back and wait. And the notion that, well, we could have just gotten more information. Why didn't you just ask for any? Well, when you get a termination letter that says this is final, gives you no indication that anything else is forthcoming. What do you do? You run into the judge. You say, Judge, now we've been terminated with no explanation. Now, the judge says in her order, well, I don't have enough before me. Well, the judge could very easily have temporarily stated, granted a TRO, and said, counsel, we're going to extend this. Nothing's going to happen now. Hold off. Don't worry. The clients are not going to be terminated in three days. I'm going to give you another two weeks to get more information. The judge could have ordered the city or asked the city to provide more information. Is there any more information? Mr. Black, I'd like to go back to the original discussion that we were having before, which is whether this is strict scrutiny or not. And if this panel, your point is that these are discretionary decisions by the citywide appeals panel. And that they came up with reasons why they decided whatever they did, but that doesn't change the character of the panel and the fact that they can exercise discretion to decide who gets accommodation and who doesn't. Is that right? And that under Fulton, it's your position that under Fulton, that that means that this is a strict scrutiny question. Your Honor, it's under Fulton, but it's also even under Smith itself, because Smith, in its decision, cites the Sherbert and Thomas as having been subject to strict scrutiny because they included the language that constitutes individualized exemptions. In Sherbert, the language was without good cause, and the court held that that good cause standard created the mechanism for individualized exemptions. Well, reasonable accommodations, a panel sitting behind closed doors deciding who lives and who dies, so to speak, is no less discretionary than without good cause. Right. I'm going to, but going back to Fulton, and I'm going to ask your adversary about this so your adversary can take note. The language in Fulton, and this is, this is going to be, this is a softball question, I have to tell you. I appreciate it, Your Honor. The language that Justice Roberts used, the creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless of whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude. That, you know, seems to me that is your, is certainly one of your stronger arguments here. It is, Your Honor, and specifically, speaking of the invitation, I should point, of the paths, the unfortunate reality here is that under the Title VII analysis, a sham determinations are enabled, and the, you know, the czar, before he beheads 99 of 100 prisoners standing before him, it doesn't help a lot if he's got a rule book that he glances at. So, you know, if the czar is... I understand your point. I have one other point, and this is not a softball. Why, how is there irreparable harm here? Your clients can be reimbursed if the injunction is denied, and they can, they eventually could be made whole in damages, and cases have said that loss of health insurance and other incidentals relative to employment are encapsulated within the general rule that employees, employee termination is not subject to a preliminary injunction. Your Honor, I know that Professor Gibson intends to address specifically the question of irreparable harm, but I would note most poignantly that five days ago, or six days ago now, the Fifth that under both constitutional and statutory provisions, because that, of course, was a private United Airlines Title VII case. It's not a government actor, but the court specifically applied the same analysis to any constitutional situation. A plaintiff demonstrates irreparable harm by alleging a violation of her right, rights to freely exercise her religion. United has presented plaintiffs with two options, violate their religious convictions or lose all pay and benefits indefinitely. That is an impossible choice for plaintiffs who want to remain faithful, but must put food on the table. In other words... The problem with that argument is that by the time this was, by the time we're dealing with, the choice had already been made because February 18th had come and gone, and you had to make a choice by that time, and this all occurs after that. So they were either terminated, or they had received an accommodation, or they had opted for the extension by that time, right? Yes and no, Your Honor. First of all... Let's take your yes first, because the reason that I say that is because if that's the case, then the whole choice question, and that being something that could perceivably be the basis for preliminary injunction, is no longer here, no longer in this case. Everybody is in one of these categories. And then, so there's nothing really to enjoy that isn't compensable by monetary damages. Not necessarily, Your Honor, because right now people are still compelled to make a decision. They can very easily go back to their employer and say, you got me. I'm vaccinating tomorrow. Let me have my job back. The city is scrambling to try to fill the positions of these teachers. Their students have been with them for a whole year prior, having substitute teachers. So these people are still facing daily turmoil. They don't sleep at night because they're figuring, what do I do tomorrow? Am I finally going to give in, put God aside, and get vaccinated just so that I can take care of my sick children and my family so they can have medical insurance? Some of them are an unpaid leave. That argument would justify preliminary injunctions in every employee termination situation. Not necessarily, Judge Walker, because this is unique. This is a very fluid situation. In the news daily, we hear that the state, the city are considering now backing lawful mandates. Maybe in a month, there won't be mask mandates. Who knows what will happen with vaccine mandates? Maybe in a month and a half, the city decides, guess what? Teachers no longer needed to be vaccinated. I don't know what's going to happen. It could happen tomorrow. It could happen in six months. Could never happen. Who knows what the city intends to do, which goes to some of its lack of general applicability. But that's another situation, another story. But right now, teachers don't know what's going to happen tomorrow. Pandemics, Your Honor, of course, don't happen every day. So this is not the same as any other situation. But there's another point. The city has precluded them, even if they signed a waiver, for example. Many of them signed a waiver, so they were not terminated. But even with the waiver, they still have the ability to go back now and say, they're not getting paid. They're on unpaid leave with the waiver signature. Matthew Kyle. This is Kyle v. City of New York. Matthew Kyle signed the waiver under duress because he had to take care of his family and his child, who has great medical. So he still is under duress because every day he wakes up in the morning and says, do I get vaccinated so I can earn an income? Do I do I just give this all up just so that I can take care of my family? He cannot work. When you sign a waiver, the city said you can't take any alternate employment. Can you tell us among your clients how many which have been terminated and how many signed the waiver? Give us a sense of what category and how many fall within each. Sure. Under the amended complaint, two plaintiffs have signed the waiver. Two plaintiffs have not yet been terminated or still waiting, awaiting citywide appeals panel determinations. Others have been terminated. Under the original complaint, I just noted that the lead named plaintiff, Matthew Kyle, has signed the waiver. Everyone else has been terminated. Of course, while this court decided in its November decision not to expand the reach of the relief that it granted to a larger class, we believe it is applicable. And there are, I don't know how many countless people who have not yet been terminated yet await decisions and every day are faced with this dilemma. I have a, just a, maybe you can help clear this up. Just in trying to understand the broader facts of this, of this case, my understanding is that from somewhere I read that 99.3% of the employees are vaccinated at this time. Do you know that? Is that? Of the, of the general employee population of the Department of Education. Right. I, I understand something. And there's 75,000, 147,000 general employees. And I think there's something on the order of about 75,000 teachers in New York. Is that, do you know if that 99.3% applies to them as well? I do not. Perhaps my colleague counsel for the city will know. But if so, we're talking about of the teachers, 525 teachers out of the 75,000 have not been vaccinated. And, and there are something like 1,700 schools in, in the system. So we're talking about one person for, for every three, three schools that has not been vaccinated. I just, you know, I, to me, it goes into, into the, into the calculation of whether there can be a reasonable comment, some reasonable accommodations. Rather than just, Judge Walker, I agree with that. I agree with that. And I know that the city has yet to explain in any concrete way why it constituted undue hardship to accommodate these plaintiffs. Um, let alone a broader class, which this court didn't grant relief to a broader class. So just how can you not have accommodated 14 or 15 people, but also, uh, there is, there is a recent decision, the Navy seals, the Biden case, uh, in, in which, uh, the, I think believes the Northern district of Texas, uh, held, uh, in some very interesting language and said, and I quote the Navy, the Navy provides a religious accommodation process, but by all accounts, it is theater. The Navy has not granted a religious exemption to any vaccine in recent memory. It merely rubber stamps each denial. That sounds almost like that language was written for this case. Um, I remember, uh, Judge Livingston was, was on, on the original merits panel. I remember arguing that oral argument to your Honor, Judge Livingston. I said, what's going to happen is if you're going to give them title seven, they're just going to say, great, undue hardship, denied, denied, denied, denied, denied. And that's exactly what they did. And that's not what a state actor is allowed to do. Can I just ask, this is my big difficulty. Let's assume for the moment that, uh, the appeal is not moved. As you say, the February 18th deadline doesn't, uh, doesn't move the appeal. I mean, you, you know, you, as the moving, as the motions panel said, you're the moving party in this litigation and you might be in a different posture if we, if some evidence had been put forward before the district court. Um, but the summaries explaining the basis for these denials are not before the district court. There's a, uh, no record developed. And so I'm having difficulty seeing why, uh, at this juncture, you could be entitled to preliminary relief other than the most, you know, other than waving the banner of strict scrutiny. And that automatically means that you win because there is not an evidentiary development here. So your Honor, first of all, there is an evidentiary development, which happens a little late, but through no fault of our own, again, it was on its face. It said final decision. We have no indication from council, from the citywide panel, from anyone that there's going to be anything else forthcoming. And when we filed our motion, our emergency motion virtually the next day, before even one business day had expired. If this city had simply picked up the phone and called and said, council, we see your motion rather than opposing it. Oops, we made a mistake. There are explanations forthcoming. Will you ask that? Will you agree to stay this motion? And we'll agree to another week and we'll, we'll provide you all those reasons. And maybe then it'll obviate your motion. They didn't do that. They sat quietly and five days later, they send a letter saying this morning, we learned that we have explanations and we're providing them to you. Now that's, that's beyond unreasonable to expect of the mover of the movement of plaintiff to have had some kind of clairvoyant awareness of, of, of these forthcoming things. So we were stuck with only one option, run to the court and say, don't and beg the court to not allow these people to be terminated. I want to also add one thing because Judge Walker, you had inquired earlier about, well, isn't it already done deal now, but most of them have been terminated. But in Elrod v. Burns, almost all the employees had already been terminated and the court there still found irreparable harm. So these are serious constitutional violations, considerations, and the fact that many, or even if all of them had been terminated, I don't think would really change the fact that there is an ongoing irreparable harm in this very fluid situation. Can you, Mr. Black, I know your time is over, but I wanted to clarify the fact on one other area. And that is my understanding is that at one point the city actually recalled people who had contracted COVID and used them as teachers. And when, when did that occur and how many people were there like that? We don't have statistics, but we do know that that is a fact. It was, we only know it from the newspapers like anyone else. It was very publicly announced that they invited vaccinated teachers back into schools. We also have it from internal documents. I believe that our clients picked up being... Well, they were vaccinated teachers. It wasn't the fact that they were vaccinated teachers that was remarkable because... No, they were infected. But they'd been infected. They had contracted the disease. Right. Right. So now there has been a whole bunch of debate in the medical science as to whether natural immunity provides greater protection than a vaccine. I don't know the answer to that, but clearly an infected teacher is more dangerous than an uninfected teacher, whether vaccinated or not. You have live COVID and you're going into a classroom. Presumably they were wearing masks. Presumably they were socially distanced. So if you can accommodate a person with live virus into the classroom, how can you not accommodate an unvaccinated person who is going to take all the required measures to protect the children and protect those around them by social distancing and wearing a mask? It would go to that question about accommodation. It would also go to the question of whether they're using the least restrictive means if this is a strict scrutiny situation. Correct. Yeah. Okay. We'll hear from your colleague. Good morning and may it please the court. Your honors, I'm going to address two fundamental errors made in the district court other than the error of applying strict scrutiny. And I think given the questions before that this may shed some light. The first is irreparable harm. And the second is allocation of burdens under strict scrutiny or under the statutory provisions. And for the first point, irreparable harm. This is the point where I prepared a little bit more. So I want to make some important corrections first to what just happened. So number one, L. Rudd v. Burns, in that case, the Supreme Court held that in First Amendment cases, irreparable harm is presumed to have occurred. This presumption is repeated over and over by the Supreme Court. And the language is very strong. There is no question that in First Amendment cases, irreparable harm is found. This circuit is an outlier, one of only two, that has in very limited circumstances deviated from that clear and present holding from the Supreme Court. And those cases are cases like Savage v. Gorski, in which this court found, in actually a remarkably similar case to L. Rudd v. Burns, which was also an employment case, that you are not going to apply the presumption of irreparable harm because of the most important difference between Savage v. Gorski and L. Rudd v. Burns, which was there wasn't ongoing coercion. Not because the employees had been terminated. In fact, in L. Rudd v. Burns, as we pointed out in our motion papers, at the time that they filed, most had been terminated but not dismissed. But by the time they reached the Supreme Court, everyone had long since been terminated. And still the Supreme Court in that case held that there was coercion present. Because in L. Rudd v. Burns, the criteria had been that employees had to switch their party in order to keep their jobs. So that coercive condition still existed, whether or not they'd been terminated. Whereas in Savage v. Gorski, this court held we can deviate because unlike in L. Rudd v. Burns, here, the plaintiffs are not being asked and they have not alleged that they have to choose that they could switch their party in order to keep their jobs. And that was the key difference. The coercive element was not there, as this court recognized quite explicitly, and we quote in our moving papers. So it really... Just why wasn't the coercion? And why doesn't that dissipate on February 18th when people are put into the various categories? They're either accommodated, they're terminated, or they're given the extension to September. Well, in L. Rudd v. Burns, the Supreme Court did not think that termination was sufficient, that terminated the coercive element of that condition. That was because it was an ongoing ability, because that was a question of whether you were in which political party you were in. And people could switch their political parties. But they've been permanently terminated, though. By the time they got to the Supreme Court, every last one had been permanently terminated, and the court recognized that. But they said that we don't look at what's happening now. We look at the status quo prior, not the status quo ante, instead of the status quo post. So they said at the time, when they filed their initial motions, they hadn't all been terminated. And they felt that it's important enough for the court to intervene in a First Amendment coercive condition such as this that is per se irreparable harm. I can give you three answers that I believe are relevant. But first, I want to say that we don't know that everybody's been terminated or waived their rights. What we do know is that Matthew Kyle received a letter saying on February 18th he had to make a choice of waiving his rights or being terminated. We also know that these same plaintiffs, as the city repeatedly complains about, have received many different notices with many different dates where they had to make this supposed final decision. They were told that they had dates in October. They were told that they had dates in November that didn't come to play. They were told in their final determinations that they have three days to make this decision. But that didn't come into play, even though we filed for an appeal two days after. They were told after the state was dissolved by the motions panel, they were not immediately terminated as they had been threatened back in December, but rather given February dates, at least Matthew Kyle. And we believe that there was a February 14th date, but then there was some confusion because there was a February 18th date. I can't say whether all 10 of my plaintiffs have received that same letter or been terminated, but even if they were, the fact remains that in New York City, if they want to get any job at all, what is in the record is that there are 83 mandates now that cover every sector of employment. So there is no possible job that any of these people can get unless they violate their faith. And they're not allowed to get unemployment insurance, and they're not allowed to get public benefits. A recent paper news article came out about that. To the extent that we're going to say that there's a changed circumstances since we filed because the city represents that they fired everybody, well, we would be allowed then to put in additional information why the coercive element is still there. And these are exactly the kinds of things we would have to talk about. But we'd have to talk about the fact that one of the proposed class members committed suicide recently after learning that the court was not going to extend protection to all employees of the DOE. And we'd have to talk about other irreparable harms that have occurred and continue to occur. However, back to the Supreme Court, one of the reasons that the irreparable harm that the—so there is ongoing coercion clearly here. But one of the reasons the Supreme Court also, I believe, made this per se standard for First Amendment protection is when it is already a violation of the Establishment Clause to put a coercive condition on the practice of religion. So if you have a state actor doing that, that's already a violation not only of the individual's rights, but it's irreparable harm for all of us to allow that to continue. So I think that that's another element. And it might also explain why cases like Brown v. Board of Education and others where people were already not allowed into school and there wasn't a coercive element would still qualify for the injunctive standard. And to come to one final point about irreparable harm, however, Your Honor— Because I just said that your time has expired. I want to make sure we hear both points that you wanted to make. I think we understand your argument on irreparable harm. So I'm glad this is your final point on it. And then I would move on. I can move on, Your Honor. I will just—I'll just move on to the other—the burdens. So in burdens, one strict scrutiny is applied. The burden then, according to this court in We the People Be Hopeful or We the Patriots is to establish that strict scrutiny applies in a free exercise claim. After that, the burden shifts to the defendant to establish that they use the least restrictive means. So the burden—you know, when the lower court really erred by placing the burden of establishing less restrictive means on the plaintiffs, it's not the plaintiff's job to supplement the city's woefully inadequate reasons for denial. That's their burden to meet. They must demonstrate. And if they didn't do it in the denial letters, at least once we filed the papers, they then had the burden to do it after the fact when the district court invited them to respond. Rather than saying, oh, you know, we clarified this morning on our due date for a response that maybe we'll come up with some more reasons that eventually we'll give to counsel, they should have given those reasons then to the court, or at least later that same day, they didn't. They didn't even get them to us before our reply went in. I don't believe they might have given it to us before the district court made a decision the next morning, but I'm not sure. The point is— Wait, could you repeat what you just said, that you might have received the summaries the day before the district court made a decision? Is that what you just said? Not the day before, because I know when we submitted our replies the day before the decision came in, we didn't have them yet. When did you receive them? It could have occurred after our replies went in, but that night before— I have them here. The date was—the time and date was December 13th at 427 p.m. And the district court, I believe, ruled in the morning of the 14th. We had already submitted our replies. I know I wrote the reply before receiving the summary. It's possible it crossed in the, you know, in payment of my email while I was seriously typing to submit a reply, but— Did you ask the district court for an opportunity to expand the record, or ask the district court to reconsider the decision based on new information? We did. We asked the district court—we filed a motion—essentially, we filed a motion for a stay pending appeal, or an injunction pending appeal, the day afterwards. No, I mean, did you ask the district court to reconsider its decision before coming here? Did you say, we have some additional evidence that we'd like to develop? Before moving for an injunction, we did. We didn't ask for a motion to renew, but again, I'm going to go back to burden. It wasn't our burden to supplement the woefully inadequate final decision. To the extent that the city wants to say that ex post facto, they wanted to come up with some reasons, that's their burden. They have to show the reasons under strict scrutiny, but also under the statutory standards. And they also have to show a lot more. The district court—the city provided nothing in response to the district court's request for a response. In their answer, they provided no factual material at all, not even a declaration from council on any of the points that they have to make. So our only point is, one, the only burden on us was to establish that this is subject to strict scrutiny and to establish a prima facie case under either the discrimination standards or Title VII, which I believe we've done. This is how. First of all, it's a matter of law about whether this type of discretionary decision is generally applicable or not. The district court erred by saying only— Are you summing up? Thank you, Ms. Gibson. I just want to—I think we understand this part of your argument, too. So if you want to sum up, we'll hear from the city. Sure. Just in sum, we did make a prima facie case under Title VII, and even there, under the through a preponderance of evidence in their answer, that they had a good faith basis, that they could not reasonably accommodate the plaintiffs. Even if you consider those ex post facto reasons that were submitted later, we can look at them. They don't meet muster under strict scrutiny or Title VII or the New York State or New York City human rights laws, and they certainly don't meet muster given that this is a represented direct evidence of a written policy that requires discrimination against unorthodox religious views. And that is a prima facie case that is very hard to rebut. You can't do it even with a showing that you have an independent good faith reason. You've got to have an affirmative defense under Trans World Airlines. They didn't have that. You can't have that in this kind of discrimination case, because unlike an age discrimination case where there might be some affirmative defense, this court and the Supreme Court has held in no uncertain terms that there can never be a valid reason for discriminating between religions. Thank you, Ms. Gibson. We'll hear from your adversary. Thank you, Your Honor. Thank you, Your Honors. May it please the court, Susan Paulson on behalf of the city at police. Your Honors, the district court providently exercises discretion in denying the plaintiff's motion simply because the plaintiffs failed to carry their burden to demonstrate their entitlement to preliminary injunctive relief. In their one and a half page letter, they cited no case law, made very few arguments generally, and none as irreparable harm specifically. They have raised some serious arguments to this court that were not considered by the They were not presented in the motion, and they were not presented with any support. The arguments they present in their brief are unpreserved. Their motion incorporated by reference prior filings that address standards that are no longer in effect. And Ms. Gibson just argued that they established a prima facie case of discrimination based upon the written policy, which I assume she was referring to the written standards and constitutionally suspect. That does not establish that the entirely distinct process operating under distinct standards by distinct adjudicators of the citywide panel was similarly constitutionally suspect. They need to develop a record in that regard. What were the standards? What were the standards that were used? Yes, Your Honor. By the panel. I know the panel made decisions, but I don't know of any standards, pre-existing standards. They just came up with whatever reasons occurred to them, didn't they? The pre-existing standards as ordered by this court were Title VII in the city and state human rights law, and those were informed by the EEOC's published guidance for how to apply Title VII in the context. What good are they if the standard is strict scrutiny? That's if you look through the lens of strict scrutiny, then you get into the question of whether or not this is, in effect, various discretionary decisions and whether those reasons that are given are, in effect, second guessing the reasons, the basic conclusion that these are sincerely held religious beliefs. Certainly, Your Honor. But there's no basis to apply strict scrutiny here. You get to strict scrutiny if they had established that the process that the city-wide panel used was neither neutral nor generally applicable. And if they had established that the process- Right. That's generally true under Smith. But everything changes, doesn't it, when there's a creation of, and I'm reading now, a formal mechanism for granting exceptions renders a policy not generally applicable regardless of whether any exceptions have been given because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude. That's the Fulton case. Yes, Your Honor. Why isn't that squarely at issue here? It's not squarely at issue here because what concerned the court in Fulton was that there was unfettered discretion, that there was unfettered discretion to deny exemptions to the policy without considering- I've read all of the answers, and one of them was reversed. The others were all affirmed. And what I don't know is what the fetters were. It just seems to me that they came up with reasons, and some of which seem to question the sincerity of the religious beliefs, even though they had acknowledged that the person did have sincere religious beliefs. Your Honor, none of them were denied based upon a questioning of the sincerity of religious beliefs. They were denied based on either a conclusion that the objection to vaccination was not based upon religious belief or on undue hardship or on both. But, Your Honor, the concerns in Fulton were unfettered discretion, which, like Smith, had this undefined standard of good cause. Those are not the circumstances here. The circumstances here are that they're applying laws that have articulated standards, and they're applying them through the lens of guidance promulgated by the EEOC that permits the employer in determining these Title VII reasonable accommodation requests from specific COVID-19 vaccination requirements to make inquiry to determine whether or not the objection is based on sincerely held religious beliefs. And the panel did exactly that. But, Your Honor, we don't have the record. Before the district court, the motion that they filed and the information they provided not only did not include those summaries which you are now referencing and discussing with me, but it included no information about the panel's process. And although the plaintiffs argue that it was not their burden, that's incorrect. On a preliminary injunction, they bear the burden of persuasion at all points. But not only that, they didn't argue in their motion that it was not their burden. There was no reason—they say that when the district court invited the parties to introduce them, there was no reason for the defendants to be alert to or consider that the plaintiffs believed that they had a burden to present. We had a one-and-a-half-page motion that cited no case law, that had no information, that they now say we should somehow have surmised that what they meant was that it was our burden, to establish that the citywide panel process was constitutionally firm, as opposed to their burden to establish a likelihood of success on the merits on their claim, that it was constitutionally infirm. If they had raised that argument in their motion, the court may have ordered the defendants to provide information. The defendants may have elected to create a record in that regard. I will note, parenthetically— They say—one of their arguments is that it was—the situation is very fluid. They'd received a notice that their clients would be terminated or would be put to the choice of termination in three days, and that they just had to seek an appeal. It's clear on the face of the notice, which—so the citywide panel process was created after there was a mandate for the rest of the city workforce to be vaccinated. It was not created in response to this litigation. It was not created for these plaintiffs. After the previous litigation here, and the recognition that the process provided in the arbitration awards was constantly suspect, the defendants offered, and the court endorsed and ordered, that these DOE individuals would get an opportunity for review by this preexisting citywide panel that was organized to consider appeals from denial of reasonable accommodation requests from the rest of the city workforce. They were not similarly situated, because the DOE employees had already been placed on leave without pay. So this did not operate seamlessly, and we own that fact. They got auto-generated messages as soon as the panel votes were in that made a determination on the request. The auto-generated notices had been generated for the rest of the city workforce, individuals who had not previously been placed on leave without pay. The notices clearly stated on their face, as this court's motions panel recognized, as the district court's decision recognized, that they had three days to vaccinate or be placed on leave without pay, a status that all of these plaintiffs had occupied since October. There was no threat of termination. The notice was incorrect, because they were already on leave without pay, but nothing in the notice said. Now, the notice was auto-generated. It wasn't until it was generated and we learned that the plaintiffs had received it and DOE had received it that the panel notified us that they had decisions that were forthcoming. We promptly notified the plaintiffs of this matter. It's in the record on A-1155. It was on two days after they filed the motion. It was on December 13th, before the district court had ruled that summaries of decisions were forthcoming, as we had been informed by the city-wide panel. When they came, we transmitted to them at the end of that same day, as Your Honor, Judge Walker noted, at I believe about 4.30 that afternoon, the day before the district court ruled. When the district court ruled, they did not seek reconsideration. They did not ask to reopen the record. They did not ask for us to be ordered to present any evidence. Instead, they immediately doubled down and appealed to this court. The arguments that they present as to strict scrutiny, as to burden shifting, as to coercion are not arguments that they developed before the district court. They didn't develop them. They didn't present a record for them. They didn't cite any case law in support. However, they have some arguments that are worthy of being litigated in a proper forum, on a proper record, in a proper posture. But they don't have arguments that can be or should be determined on their merits by this court in a request for preliminary injunctive relief that was made, you know, essentially without any support. I'll just return and say, in particular, as to irreparable harm, the district court noted that the plaintiffs neither attempted to nor demonstrated irreparable harm. They have arguments in that regard that they presented to this court that they did not present in their motion to the district court. Well, they make the argument here that Elrod says that irreparable harm is presumed. Your Honor. What do you, what's your response? Yes, I don't believe that Elrod speaks that broadly. So irreparable harm is presumed when there's a likelihood of success on the merits on a First Amendment claim. And Elrod says a possible constitutional violation is not irreparable harm. You're saying there are issues here that, if properly litigated, could result in a finding that strict scrutiny was not, you know, that the justification is insufficient. I'm sorry, Your Honor. The justification where? You're saying that there are issues here going to whether or not strict scrutiny is satisfied by the, by the citizen. Certainly, there are issues as to whether strict scrutiny should apply because you know information that the panel's process was not neutral or generally applicable. Your point is that they didn't litigate that issue before. Correct. And then if litigated, right. So if it turns out that strict scrutiny is the applicable standard, then wouldn't the Elrod presumption kick in? Wouldn't the, pardon me? The Elrod presumption, the Elrod presumption would kick in under those circumstances. Yes. I think if strict scrutiny applied, they would, and they had, they arguably would be closer to demonstrate a likelihood of success on the merits on their First Amendment claim because in Elrod, they said that the injury was threatened and occurring at the time of the respondent's motion and the respondent sufficiently demonstrated a probability of success on the merits. That's what Elrod depended on. But then it also said the court might properly have held. The court didn't say that the court necessarily had to hold that that constituted reprobate. The court might properly have held under those two situations. But most critically, that second situation is completely absent here. They have not sufficiently demonstrated a probability of success on the merits. And for that reason, the Elrod presumption has no application here. In addition, as Your Honor correctly recognized, any harm occasioned by the coercive deadline by which the plaintiffs had to make a choice has now passed. The named plaintiffs who were before this court, not whoever is in the amended complaint that was filed on January 7th after the district court had decided on this motion. Let me just go to this. Let me go to some of these facts that I asked your adversary. Sure. How many people have been vaccinated now in the citywide population of DOE of 147,000? Is it 99.3? Yes, that is my understanding. Is that also true of the teachers as well? The teachers are a lesser number within that universe, right? I apologize, but I don't know. That number applies to the DOE workforce. So I don't know. About teachers. It's 99.3% of the 147,000 basically. But if it's 147, then that means the remaining 0.7% of 1% is 1,029. And there are 1,700 public schools. Obviously, you can't do averages, but there obviously could be quite a number that are unvaccinated in one place and none in the other. But still, we're talking about a relatively small number. And it surprised me that out of 1,029, there wouldn't be, if it's 0.7, then accommodations couldn't be found somehow. Father, again. In general, and we get the sort of boilerplate response on the individuals here, that hardship is there because the person has to be in a classroom. And I just don't know whether that's sound or not. It casts some doubt to me on the responses on December 13th. Certainly. And the problem here, again, is that we don't have a record to understand that. It's clear from those summary decisions where it says DOE established, and we have represented our papers that the panel sought from DOE information to defend their undue hardship argument. That information is not before the court. The plaintiffs did not request that information. We cannot properly evaluate your reasonable question of why they couldn't accommodate these teachers. That information as to what would be involved, what the expense would be, what the operational cost, what the numbers would be, what the various considerations that DOE presented to the panel. One other thing on the undue hardship, and that is the question of bringing in teachers who actually have had COVID and are still recovering from COVID to teach. If you could do that, it's hard to see why it's justified to exclude the people who would be masked and tested and so forth and wouldn't have COVID and let them teach. Without their vaccinations. I'm not aware of any information that the DOE invited teachers who they thought were still infectious with COVID back into the classroom. You know, as one of my adversaries acknowledged, the guidance coming from CDC has been ever changing in this regard as to five days or 10 days. There are a lot of little details in this case, and I can't put my finger on exactly where I read that, but it was somewhere in the papers. Article that they annex. But again, as I said, I'm not aware that any teachers whom they were aware were still infectious. Your point is there hasn't been any discovery on any of this. There's been no discovery whatsoever. Your Honor, I would just conclude by saying that the district court saw this motion for what it was premature and wholly undeveloped. The district court was not slamming the door to the plaintiffs to develop their case and to press these claims. You know, as this court has recognized, there are some difficult issues here that are worthy of attention. But in coming to court and requesting the extraordinary relief of an injunction, the plaintiffs bore the burden and they simply failed to meet it. Can I just ask one question? Sorry to do it as you're summing up, but I think you were going to address the question of mootness and the February 18th deadline and what you may know about the status of the plaintiffs. Yes, Your Honor. Of the 15 plaintiffs who are before the court, two of them have received accommodations. One of them, Matthew Kyle, has elected to remain in the extended leave without pay program through next fall, and the remaining 12 were terminated effective February 18th. Thank you. Thank you very much. For all those reasons, I would ask that the district court's decision be affirmed. And we'll hear rebuttal. Thank you, Your Honor. It's a little hard to communicate on the Zoom. Thank you all for your arguments. I'm going to try and enforce the clock pretty strictly on rebuttal if there are no questions from my colleagues, just because we have two additional cases to hear this morning. But with that said, Mr. Black? You're using up your time. I'm sorry, do you hear me? Yes, we won't count those seconds against you. I'm sorry, Your Honor. Thank you for your patience. Your Honor, it is true that the courts of hell, that monetary damages generally do not alone provide the basis for a preliminary injunction. But context tells a whole other story. These are teachers. They aren't wealthy. Their careers are driven by a tenure track, seniority, and a clean record. The city has engaged in frightening hostility toward those who have committed their lives to our children. It has prohibited them from taking work elsewhere. It has canceled their health insurance. It has reported them to the Department of Labor as having engaged in misconduct. It has actively sought to hurt them for no reason other than their wanting to stand by their religious convictions. First name plaintiff Matthew Kyle is an ordained deacon of the Russian Orthodox Church. His wife homeschools their six children, including six month old John, who suffers from Down syndrome. Deacon Kyle was coerced to waive his constitutional rights in order to maintain health insurance coverage without which the family cannot afford to pay the massive medical bills associated with caring for sweet little John. If having to choose between your faith and your child's health is not irreparable harm, then what is? If having to choose between your faith and 35 years you've invested in your career is not irreparable harm, then what is? If having to choose between your faith or becoming unemployed with no real alternate opportunities is not irreparable harm, then what is? And finally, in what universe is terminating hundreds of teachers and leaving them and their families without income, health insurance, and professional options not irreparable harm? And how is this even humane? I thank the court for its time and consideration. Thank you, Mr. Black. We'll hear from Miss Gibson. Thank you, Your Honor. Your Honors. Oliver Wendell Holmes warned that great cases like hard cases make bad law. He clarified that great cases are called great not by reason of their importance, but because of some accident of immediate overwhelming interest, which appeals to the feelings and distorts the judgment. This is such a moment. In times like this, emotions are running high now in year three of this pandemic. In times of pandemics historically, people have looked for a scapegoat on which to unleash their fear and their frustration. Here, the unvaccinated, particularly those heretical people who are in the minority and have religious beliefs that prevent vaccination, are such a scapegoat. New York has made no bones about this, both at the state government and city government level. Decision makers have gone to the press and called these beliefs invalid. They have said that the Pope counseled them that these heretical thoughts are not in line with what he believes is required of faith. The same DOE lawyers that judged these fresh considerations are the very ones who went to the heresy inquisitions and asked that each of these employees be denied accommodation because their beliefs conflict with the Pope's. This is not a fresh look and you cannot whitewash what has occurred in this case, which is the basis for being here. This court did not send them back to moot the case. This court sent them back for injunctive relief, which you said that they deserve. In this case, our plaintiffs have met their burdens. They have established that they're entitled to strict scrutiny. They have established a prima facie case that they have religious beliefs and were denied accommodation after bringing this to the attention of their employer. They clearly put that in their moving papers and said that the summary denial saying does not meet criteria were not enough to meet the criteria of Title VII, leave aside strict First Amendment protections. That is what they said in their letters. To the extent that the defendants do not understand that they then bear the burden of showing that they employed the least restrictive measures and that they had a good reason for this under the statutory and constitutional standards, that is not the plaintiff's fault and cannot be used against them. In fact, it strengthens why these plaintiffs deserve protection. I will say one more point, which is that the district court recognized very clearly that the three-day deadline was upon these plaintiffs. I'll bring the court's attention to page 11, footnote 10 of the district court's order, in which the court said quite specifically in response to the Kyle plaintiff's reply, which suggested perhaps this isn't a real termination deadline of three days. Perhaps the injunction from the Second Circuit staying terminations is still in effect. The court said, the court disagrees. The Second Circuit ordered that the injunction will remain in place during reconsideration of plaintiff's renewed requests for religious accommodations. As plaintiffs acknowledge, at least as to them, the proceedings before the citywide panel have concluded. Therefore, the Second Circuit's injunction is no longer in place. The district court recognized, as we recognize for our plaintiffs, that with the injunction dissolved, nothing stood in the way of termination of these plaintiffs. Within three days, they had to decide whether to waive their rights to sue or be terminated and lose health insurance. And Matthew Kyle received his denial on the 8th, before the supplemental materials were due. And for him, that deadline was Monday. For the rest, it was Wednesday. And so this court is tasked with the difficult job of upholding the rights of an unpopular group during a time when everyone is enormously stressed and scared. But this court is all they have to protect them from the mob. And it is this court's sacred duty to do so, upholding the Constitution and the statutory protections that exist. Thank you, Your Honors. Thank you, Ms. Gibson. We will take the matter under advisement.